UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


MELISSA CUTLIP,

          Plaintiff,

v.                                    Civil Action No. 2:10-1314

UNITED STATES OF AMERICA,

          Defendant.

<u>MEMORANDUM OPINON AND ORDER</u>


          On June 6 and 7, 2012, the court conducted a bench
trial in this action.  On June 29, 2012, plaintiff submitted her
supplemented findings of fact and conclusions of law.  On July
13, 2012, the government submitted its revised proposed findings
of fact and conclusions of law.  The matter is submitted for
decision.


I.


          This action arises out of the purported failure of Dr.
Devon M. Ciliberti, M.D. ("Dr. Ciliberti"), to properly treat
the plaintiff, Melissa Cutlip, during her January 17 through
January 20, 2009, hospitalization.  The court's findings of fact
follow.  Each finding is made by a preponderance of the
evidence.

A.    Relevant Medical History Prior to January 17, 2009

        Ms. Cutlip was 31 years old at the time of the treatment at issue.  She first visited Dr. Ciliberti, a doctor employed at Family Care Health Center ("Family Care"), on June 25, 2008, at Family Care's office located at 116 Hills Plaza in Charleston, West Virginia.  (Stipulation of Facts ("Stip.") at 1).[1]  She was seen by Dr. Ciliberti, an obstetrician and gynecologist, based on a referral from the Women's Health Center of West Virginia.  (Id.).  At this visit, she was found to be 5 feet 2 inches tall, weighed 221 pounds, with blood pressure of 128/68.  (Id.).  At that visit, she complained of painful periods and pelvic pain.  (Id. at 2).  Dr. Ciliberti performed a physical gynecological examination that he interpreted as normal and stated in his treatment note that Ms. Cutlip had suffered from chronic pelvic pain for the past six years.  (Id.).  Dr. Ciliberti offered to treat her with Lupron and OCPs (contraceptive pills), or perform a laparoscopic assisted vaginal hysterectomy ("LAVH").  (Id.).  After Dr. Ciliberti discussed the risks and benefits of those treatment options with her, she chose to be treated with Lupron.  (Id.).  She received a Lupron injection on that visit.  (Id.).

_____

        [1] The parties filed a joint stipulation of facts on June 1, 2012.

Ms. Cutlip returned to Family Care on July 29, 2008, to see Dr. Ciliberti on a follow-up visit.  (Id.).  Records from this visit indicate that she received a second injection of Lupron. (Id.).  She revisited Family Care on September 2, 2008, and was seen again by Dr. Ciliberti.  She complained of continuous bleeding, presumably vaginal in nature, since July 30, 2008.  (Id.).  Dr. Ciliberti concluded that they would try one more month of Lupron, and if that proved unsuccessful, LAVH would be considered.  (Id.).

Ms. Cutlip returned to Family Care on October 2, 2008, at which time she complained of pelvic pain and bleeding. (Id.).  After discussing the options, including LAVH, she decided on LAVH, to be scheduled after her college finals were completed in December 2008.  (Id. at 2-3).  A preoperative visit to Family Care occurred on December 11, 2008, during which time Dr. Ciliberti noted that her past medical history included surgery consisting of a cone procedure on her cervix, bilateral tubal ligation, gallbladder surgery, and a LEEP procedure (to remove precancerous cervical cells).  (Stip. at 3).  Dr. Ciliberti ordered preoperative testing for her, including an electrocardiogram and complete blood count without differential, and he also ordered her to have bowel prep performed prior to

3

the surgery.  (Id.; Tr. at 26:22-27:9; 28:2-11).[2]  Ms. Cutlip was scheduled for the LAVH to be performed on December 16, 2008, at Charleston Area Medical Center, Women and Children's Hospital ("CAMC").  (Stip. at 3; Tr. at 16).

Dr. Ciliberti performed the LAVH on Ms. Cutlip on December 16, 2008, at CAMC.  Dr. Emily Montgomery, a resident physician, assisted him during the procedure.  Plaintiff's uterus was removed, and she was discharged from the hospital on December 17, 2008.  (Stip. at 4-6).  Dr. Ciliberti found no evidence of endometriosis, extensive pelvic adhesion disease, scar tissue, or inflammation; it was essentially a "clean pelvis."  (Tr. at 30:13-31:4).  Ms. Cutlip was given various discharge instructions, and she was told to call the doctor if she experienced increased vaginal bleeding, a fever of 101 degrees, increased abdominal pain or incision redness or

---

[2] Bowel preparation, or "bowel prep," is a cleansing of the intestines from fecal matter and related substances.  Dr. Ciliberti explained its purpose:

> Any time that I suspect anybody who has got pelvic pain, there could be adhesions, there could be endometriosis, there could be bowel involvement, I like to give a bowel prep to the patient, so if there's an injury to the bowel, that it would diminish the chances of potentially getting peritonitis or infection in the pelvis if that were to occur.

(Tr. at 27).  He also noted that bowel prep order was "not routine" for pelvic surgery.  (Id.).

4

drainage.  She was also instructed to follow-up with Dr.
Ciliberti in four weeks.  (Stip. at 6).

On January 3, 2009, Ms. Cutlip presented to the
emergency room at CAMC where she complained of pain in her lower
back and stomach, weakness, fever, chills, nausea, and headache.
(Id.; Tr. at 196:6-17, 197:5-7).  Emergency room physician Dr.
Kimberly Ewing examined her and then ordered a CT scan of her
abdomen and pelvis.  (Stip. at 9).  The CT scan was performed
without intravenous contrast and read as essentially normal.
(Id. at 9-10; Tr. at 34:10-20).  On the same day, a physician's
assistant in the CAMC emergency department contacted Dr. Anna
Basso, a physician employed by Family Care who was on call for
Family Care patients, by telephone to discuss Ms. Cutlip's
presentation.  (Stip. at 10).  The emergency physician and
physician's assistant planned to send Ms. Cutlip home after
diagnosing a urinary tract infection and intended to prescribe
Bactrim, an antibiotic, for the condition.  (Id.).  Dr. Basso
agreed with their plan and further recommended that Ms. Cutlip
be informed to see Dr. Ciliberti in the office at Family Care
during the following week.  (Id.).  The physician's assistant
noted that Dr. Basso did not think that the complaints of Ms.
Cutlip on January 3, 2009, were a complication of the LAVH
performed by Dr. Ciliberti. (Id. at 10-11).  The physician's

assistant's note states that when she spoke with Ms. Cutlip, she agreed to go home with an antibiotic and pain medication. (Id. at 11). She was also instructed to return to the hospital if her condition worsened. (Id.).

Ms. Cutlip returned to the CAMC emergency room on January 8, 2009, complaining of persistent abdominal pain. (Tr. at 197:15-198:1). She was treated in the emergency department by Dr. Piayon Kobbah, CAMC emergency physician, and Jennifer Spencer, PA-C, CAMC emergency physician's assistant. (Id.). A CT scan of plaintiff's abdomen and pelvis done with IV and contrast indicated a complex right adnexal mass with multiple cystic components, the largest being six centimeters. (Id. at 14; Tr. at 37:15-38:24). Dr. Kobbah ordered that Ms. Cutlip be admitted to CAMC on January 9, 2009. She was admitted to the service of the Family Care physicians. (Stip. at 14). Dr. Vellore Kasturi, an obstetrician and gynecologist at Family Care, was the physician on call for Family Care at the time Ms. Cutlip was admitted to CAMC, and Dr. Kasturi served as her attending physician during this admission. (Id.). Dr. Ciliberti did not write any orders for Ms. Cutlip during her hospitalization of January 8 through January 16, 2009. (Joint Ex. 4, pp. 91-94; Tr. at 46:20-47:13).

6

Dr. Kasturi, Dr. Ciliberti, and Dr. Basso saw Ms. Cutlip (at various times as stated in the hospital records) at CAMC during this hospital admission, which lasted from January 9 to January 16, 2009.  (Id.).  A transvaginal ultrasound was performed on January 9, which showed an enlarged right ovary measuring 7.4 by 5.2 by 5.1 centimeters.  The impression from this was "[c]omplex cysts in both ovaries.  Findings may relate to endometriomas.  However, other neoplastic etiologies cannot be excluded on this examination and follow-up may be necessary."  (Joint Ex. 4, p. 53; Tr. at 42:13-43:11).[3]  Dr. Ciliberti first saw plaintiff during this hospitalization on January 12, at which time he wrote a progress note indicating that he suspected a possible tubo-ovarian abscess ("TOA").  (Joint Ex. 4, p. 45; Tr. at 43:22-44:22).

Dr. Kasturi discharged Ms. Cutlip from CAMC on January 16, 2009.  (Stip. at 15).  Dr. Kasturi stated that her diet could be "as tolerated," that she should do pelvic rest for six weeks, and follow-up with Dr. Ciliberti in one week.  (Stip. at 15).  According to Dr. Kasturi's discharge summary, Ms. Cutlip

---

[3] An endometrioma is a cyst or tumor containing endometrial tissue.  The endometrium is the mucous membrane lining the uterus.  See MedilinePlus Medical Dictionary, a service of the U.S. National Library of Medicine and National Institutes of Health, at http://www.nlm.nih.gov/medlineplus/mplusdictionary.html.

received IV antibiotics from the time of her admission through
January 14, at which time she was switched to oral antibiotics.
Her abdominal pain and nausea had resolved, and she had regular
bowel movements.  She was discharged to home on two oral
antibiotics.  (Joint Ex. 4 p. 232).  Dr. Kasturi also advised
Ms. Cutlip to call if, after discharge, she developed a fever
exceeding 38.3 degrees Celsius, experienced nausea or vomiting,
or had increased pain.  (Stip. at 15-16).

        With the foregoing as background, the only treatment
of Ms. Cutlip by Dr. Ciliberti at issue in this case occurred
from January 17 through January 20, 2009.

B.    Hospitalization of January 17 through January 20, 2009

        Ms. Cutlip returned to the CAMC emergency room by
ambulance on Saturday, January 17, 2009, at 8:50 a.m.,
complaining of nausea, vomiting, and abdominal pain.  (Id. at
16; Joint Ex. 5 p. 521).  Dr. Ewing, who evaluated plaintiff,
contacted Dr. Ciliberti, the Family Care physician on call, at
10:00 a.m. regarding plaintiff's condition while Ms. Cutlip was
in the emergency room.  (Id.).  The emergency room note authored
by Dr. Ewing states under the section titled "PLAN," in
pertinent part:

                            8

Dr. Ciliberti wanted a CT scan with contrast to be started here in the Emergency Department to rule out also an appendicitis. She had previous two CT scans on the 9th and the 3rd which did not make mention of the appendix itself. The last CT scan showed multiple cysts in the follicles in the right ovary with the largest at 3 cm. It was recommended an ultrasound at that time which an ultrasound was performed. Ultrasound showed a complex cyst in both the ovaries with a right ovary to complex in the right ovary. Question endometriosis or neoplastic process.

(Id. at 18).  Plaintiff was admitted under the service of Dr. Ciliberti who first saw her at 1:15 p.m.  He prepared a history and physical evaluation note that states in part:

HISTORY OF PRESENT ILLNESS: The patient is a 32-year-old G3, P2, status post laparoscopic assisted vaginal hysterectomy who was readmitted for questionable TOA for 5 days on IV antibiotics. The patient was discharged home on the 15th (sic, 16th), was readmitted on the 17th due to nausea, vomiting and diarrhea. The patient also states she has right lower quadrant pain. The patient was on previous IV antibiotics and states that she is keeping some things down but not much.

***

PHYSICAL EXAMINATION:
VITAL SIGNS: Temperature 37.6, blood pressure stable.
LUNGS: Clear to auscultation bilaterally.
HEART: Regular rate and rhythm.
ABDOMEN: soft, rebound. Diffuse tenderness but positive bowel sounds.

LABS: White count is 20. All else is normal. Acute abdominal series was noted to be no evidence of obstruction or ileus.

ASSESSMENT AND PLAN: 32-year-old with abdominal pain, questionable appendicitis. Will get surgery consult. Also CT scan has been ordered. Advised use of oral contrast if the patient cannot tolerate it. instructed (sic, Instructed) she will need to have an NG tube placed down the nose to have it put in. The patient

states she would agree and will await results of CT
and surgery consult.

(Stip. at 18-19).[4]  A CT scan with contrast was performed on Ms.

Cutlip's abdomen and pelvis on January 17 shortly after 5:10

p.m.  (Stip. at 19-20; Joint Ex. 5, pp. 393, 205; Tr. 57:11-21).

Dr. Michael Anton, radiologist, prepared a report which stated

his findings and then concluded as follows:

> IMPRESSION: Interval development of moderate right-
> sided hydronephrosis and hydroureter. This extends to
> the level of the pelvis. A heterogeneous enhancing
> fluid collection is present. This could represent a
> large hematoma, hemorrhagic mass arising from the
> right ovary, or abscess. Currently, it measures 8.3 x
> 6.2 cm. Previously, it measured 5.2 x 4.3 cm.
> Extensive inflammatory Changes of the retroperitoneum
> are also increasing.

(Stip. at 20).  Dr. Ciliberti requested a consultation from the

general surgical service regarding Ms. Cutlip for possible

appendicitis.  (Id. at 19).  That consult was completed around

7:00 p.m. on January 17, following Dr. Ciliberti's receipt of

the results of plaintiff's CT scan.  (Id.).  The general surgeon

performing the consult, Dr. Lohan, a colorectal surgeon, did not

believe Ms. Cutlip had appendicitis and recommended that Dr.

Ciliberti continue the management of Ms. Cutlip's pelvic abscess

per his clinical judgment.  (Id. at 19-20; Joint Ex. 5, p. 36;

---

[4] The evaluation note erroneously notes plaintiff as 32
years old.  Born August 12, 1977, plaintiff was 31 years old at
this time.  (Tr. at 188).

Tr. 54:16-55:3, 60:6-61:14;).  No further action was taken that
night.

        Approximately 17 hours after the surgical consultation
that effectively ruled-out appendicitis, Dr. Ciliberti's next
progress note, timed at noon on Sunday, January 18, 2009, stated
as follows: "Patient without complaints; vital signs stable;
afebrile; lungs clear to auscultation bilaterally;
cardiovascular rate, regular rate and rhythm; abdomen soft,
mildly tender, positive bowel sounds. Assessment and plan,
thirty-one year old status post LAVH with questionable TOA.
Continue IV antibiotics. Possible CT drainage versus
laparoscopy." (Stip. at 20-21; Joint Ex. 5, p. 49; Tr. at
62:22-63:10).  The CT-guided drainage of the abscess, also
referred to as CT guided aspiration, was not ordered on January
18.[5]  Dr. Ciliberti did speak with a radiologist about performing
the aspiration procedure, but the radiologist, without
explanation, refused to do so.  Dr. Ciliberti did not pursue the
matter further.  (Joint Ex. 5, p. 205; Tr. at 65:7-25).

_____

        [5] Plaintiff states, critically, that Dr. Ciliberti wrote no
orders concerning plaintiff on January 18 and January 19.
Defendant responds that this argument is disingenuous inasmuch
as Dr. Ciliberti's orders of January 17, 2009, were continuing
orders requiring ongoing care, including the administration of
IV antibiotics, IV fluids, and other medications that continued
to optimize her condition.  (Tr. at 258-62; Joint Ex. 5 at 201-
06).

Dr. Basso saw Ms. Cutlip on Monday, January 19. (Stip. at 20).  Her progress note for that day, written at 11:00 a.m., included the following:

> Assessment/Plan: thirty-one year old status post LAVH, second admission secondary to right adnexal mass complicated by right moderate hydronephrosis. Per report by Dr. Ciliberti he is going to discuss case with gyne-oncologist Dr. Schiano for plan of care.

(Id. at 21; Joint Ex. 5, p. 50; Tr. at 66:8-67:17).  Dr. Basso testified at her deposition that during her conversation with Dr. Ciliberti on January 19, she gave her opinion that Ms. Cutlip should go to surgery on that day and that he replied that he was planning surgery for Ms. Cutlip and would take care of it.  (Joint Ex. 8 (Basso dep.), p. 26:15-27:17).

At trial, Dr. Ciliberti did not recall Dr. Basso telling him that she thought Ms. Cutlip needed to go to surgery that day, January 19, though he did not deny that it may have occurred.  (Tr. at 67:21-23).  No formal consultation by Dr. Schiano was requested by Dr. Ciliberti, but he did personally speak with Dr. Schiano regarding Ms. Cutlip, including the fact that there could be potential bowel involvement if there were an infectious process present in her abdomen.  Dr. Schiano testified at his deposition that Dr. Ciliberti did seek his advice regarding the management of the problems faced by Ms. Cutlip.  (Joint Ex. 10 at 9-10).  Dr. Schiano informed Dr.

12

Ciliberti that he should consider whether radiology would consider using CT guided aspiration to drain the abcess, and, if that was not possible and she had not then improved, that it would probably require an operation.  (Id.).  This conversation between the two doctors occurred face-to-face in the hospital.  (Id. at 10-11).  Dr. Ciliberti also sought Dr. Schiano's availability for an intraoperative consultation if needed.  (Tr. at 71:7-21).  When pressed about the timing of the surgery, particularly why he did not take her to surgery at an earlier time, Dr. Ciliberti explained as follows:

> One of the issues is, is, you know, she was not in any
> acute distress.  She did not need to be rushed into
> the OR.  I was not in – I was in the office that day
> on I believe it was Monday, the 19th.  So I did not
> have an OR slot anyway.  Dr. Schiano operates on
> Tuesdays, along with myself.  That's why we were
> trying to formulate a plan to see if we could get her
> on the OR schedule for Tuesday, which it takes, you
> know.
>
> ***
>
> And she was not, like I said, I'll repeat it again,
> she was not in any acute problem.  She did not need to
> be rushed off to surgery on the 19th.  You know, the
> last thing we wanted to do was take the patient back
> to surgery with a potential infectious pelvis.

(Tr. at 81-82).

On the morning of Tuesday, January 20, 2009, at 9:35 a.m., plaintiff signed a surgery consent form for performance of a laparotomy and right salpingo-oophorectomy by Dr. Ciliberti.

13

(Joint Ex. 5, p. 18; Tr. at 79, 18-20).  He ordered pre-operative IV antibiotics at 1:25 p.m.  (Joint Ex. 5, p. 206; Tr. 78:20-79:8).  Dr. Ciliberti prepared a progress note which stated as follows:

> Patient still with right lower quadrant pain; NPO [nothing by mouth]. Vital signs stable; afebrile; lungs clear to auscultation bilaterally; cardiovascular: regular rate and rhythm. Abdomen: soft, diffuse tenderness, positive bowel sounds. Assessment and plan: thirty-one year old with right hematoma versus abscess. Radiology refused CT guided biopsy. Patient offered IV antibiotics versus XLAP/RSO with risk discussed at length. Patient firmly desiring to proceed to surgery.

(Stip. at 21).  Unlike plaintiff's prior surgery on December 16, 2008, Dr. Ciliberti did not order a bowel prep prior to plaintiff's laparotomy.[6]

Dr. Ciliberti performed surgery on Ms. Cutlip on January 20 at 2:14 p.m., assisted by Dr. Michael Subit.  (Stip.

---

[6] When pressed as to why he did not order a bowel prep prior to surgery, Dr. Ciliberti claimed that it was unnecessary inasmuch as plaintiff had not eaten for two days.  He conceded, however, that he did not know if plaintiff had had a bowel movement during that time.  (Tr. at 83-84; 88).  See also supra note 2 and accompanying text.  Even so, Dr. Basso's treatment note from January 19 at 11:00 a.m. indicates that plaintiff had had a bowel movement. (Stip. at 21; Joint Ex. 5, p. 50; Tr. at 66:8-67:17).  Moreover, plaintiff's expert, Dr. Kent Miller, did not testify at trial that a bowel prep before the January 20, 2009, surgery was necessary or that the failure to perform such a procedure affected the outcome.  Indeed, no evidence indicates that Ms. Cutlip developed peritonitis after the January 20, 2009, surgery.  (Tr. at 114-15).

14

at 21; Joint Ex. 5, p. 93; Tr. at 83:4-15).  Dr. Ciliberti's

operative note states in pertinent part:

> PROCEDURE: The patient was taken to the operating room
> where general anesthesia was administered. The patient
> was placed in dorsal lithotomy position. Patient had a
> Foley catheter inserted into the bladder. A vertical
> incision was made from the pubic bone to the
> umbilicus. This was carried down to the underlying
> fascia and the fascia was extended vertically using
> Bovie cautery. The peritoneum was then entered
> bluntly. At this point the abdominal contents were
> packed out. It was noted that the large bowel and
> small bowel were matted in the pelvis. There was an
> approximately 10 cm mass in the right midline. At this
> point the mass was freed up digitally. Contents of the
> mass were then spilled into the pelvis after trying to
> remove the mass en bloc. The pelvis was then copiously
> irrigated and portions of the mass were removed. The
> IP ligament was then identified and transected and
> tied using 2-0 vicryl. At this point it was noted that
> there was possible bowel injury. Once part of the mass
> was removed and the pelvis freed up it was unsure
> whether this was large or small bowel. At this point
> intraoperative consult was then performed. Dr. Michael
> Schiano came in to examine this. The bowel was then
> run thoroughly. It appeared that the small bowel was
> normal but all lower descending colon and rectum had
> appeared to have a perforation or had been opened. At
> this point, Dr. Schiano performed extensive
> adhesiolysis with colostomy and Hartmann's pouch.
> After his procedure, which will be dictated, was
> performed a round large Duval drain was placed in the
> abdomen. The fascia was reapproximated using 0 nylon.
> The subcutaneous was reapproximated using 3-0 plain
> and the skin was closed using staples. The patient
> then had her stoma maturated and was taken to recovery
> room in stable condition.

(Stip. at 22-23).

At trial, Dr. Ciliberti explained that when he entered the abdomen, he immediately noticed that the small bowel and the large bowel were "matted together," and found a 10 centimeter mass that he suspected was the abscessed ovary, potentially containing infectious material.  (Tr. at 88:22-89:10; 89:11-20).[7] After removing the mass digitally (that is, with his fingers), Dr. Ciliberti noticed a damaged area of the bowel, though he could not determine whether it was the large or small bowel. (Tr. 90:24-91:13; 91:17-92:16; Joint Ex. 5, p. 99).  At that point, he cross-clamped the bowel to avoid anything spilling into the abodomen, and requested the assistance of Dr. Schiano, who was on standby and who then came to the operating room, removed the adhesions, and proceeded to perform a colostomy. (Id.; Tr. at 88-94).  Dr. Schiano's addendum to the operative note prepared by Dr. Ciliberti states in relevant part:

---

[7] Defendant's expert, Dr. Ted Anderson explained at trial the most likely clinical course for the development of plaintiff's TOA.  He testified that at some point after her hysterectomy on December 16, 2008, Ms. Cutlip likely ovulated. This resulted in a hemorrhagic or blood filled corpus luteum cyst, which subsequently became infected, walled itself off, and developed into an abscess.  (Tr. at 254-56).  The abscess was treated with intravenous antibiotics during plaintiff's hospital stay of January 8 through January 16, 2009, and her condition improved.  Shortly before discharge, Ms. Cutlip was switched to oral antibiotics in anticipation of her going home.  Dr. Anderson testified that it was the switch from the more effective intravenous method of administering antibiotics that allowed plaintiff's condition to worsen, necessitating her return to the hospital a day later, on January 17.  (Tr. at 252-53).

ADDENDUM

\*\*\*

> After an intraoperative consultation request was
> obtained from Dr. Ciliberti I joined the operative
> team. He reported to me that he had excised the right-
> sided pelvic abscess and in the course of this
> excision he suspected a colon injury. Examination of
> the pelvis revealed that the descending colon had been
> cross-clamped and partially divided and that a segment
> of about 12 cm length of the sigmoid colon had been
> completely deserosalized and the muscularis of this
> portion of the small (sic, large) bowel was also
> significantly damaged. There were no other
> abnormalities in the pelvis noted. The left fallopian
> tube and ovary appeared normal. There were no other
> abscesses found within the pelvis. The upper abdomen
> was then explored and normal upper abdominal viscera
> were present. There were no abscess collections within
> the upper abdomen. There was no obvious injury to the
> liver, spleen and the stomach was intact without
> evidence of perforation. The small bowel was then run
> from the ligament of Treitz to the ileocecal valve and
> the colon carefully examined from the cecum to the
> site of the sigmoid colon injury and no other
> abnormalities of the colon were noted.

(Id. at 23-24).[8]


        While Dr. Ciliberti testified at trial that he did not

make an incision into the bowel and did not attempt to resection

the bowel before Dr. Schiano arrived, (Tr. 95:8-12), Dr.

---

        [8] In his deposition, Dr. Schiano corrected what he termed a
typographical error made in his surgical addendum.  Part of the
second sentence of his operative note, which states that "the
muscularis of this portion of the small bowel was also
significantly damaged," should be read as referring to the
"large," not "small" bowel.  (Joint Ex. 10 (Schiano dep.) at
19).  The correction is noted above by the court.

17

Schiano's reference to the bowel having been "partially divided"
meant that the bowel had been surgically incised -- not merely
torn -- prior to Dr. Schiano's arrival in the operating room.
(Joint Ex. 10, pp. 6-11).  Dr. Ciliberti also testified that it
was Dr. Schiano who had separated the mesentery from the bowel,
not him.  (Id.).[9]  The court credits Dr. Schiano's deposition
testimony that the separation of the mesentery was already done
and was observed by him upon his entry to the operating room.
(Joint Ex. 10 (Schiano dep.), pp. 22-23).  It was conceded by
Dr. Ciliberti that he could not differentiate between the small
and large intestines, while Dr. Schiano was able to tell the
difference.  (Id. at p. 21:9-10; 25:3-10; Joint Ex. 5, p. 99;
Tr. 91-92).

          Following the surgery, Dr. Telly Barreta reported his
pathological diagnosis of the tissue submitted for pathology.
Dr. Barreta's diagnosis was principally as follows:

---

     [9] The mesentery is the "connective tissue that supports the
structure of the intestinal system itself, and most importantly,
that is what carries the blood supply from the great vessels in
the abdomen to whatever portion of the [gastrointestinal] tract
is supported by that specific part of the mesentery."  (Joint
Ex. 10 (Schiano dep.) at 24).

DIAGNOSIS

***


3. "PELVIC ABSCESS, RIGHT TUBE AND OVARY AND
PORTION OF RIGHT BOWEL."
TUBO-OVARIAN ABSCESS, ORGANIZING, WITH FOCAL
ADHERENT AND SEPARATE SEGMENT OF COLON
SHOWING SUBMUCOSAL EDEMA, TISSUE DISRUPTION
WITH MUCOSA SEPARATE FROM MUSCULAR LAYER.
SEPARATE SEGMENT OF COLON (12.5 CM) WITH
RELATIVELY INTACT PORTIONS AND WITH RESECTION
MARGINS SHOWING WELL-PRESERVED LAYERS
WITHOUT NECROSIS.
BLOOD CLOT FRAGMENTS WITH INTERMINGLED
NECROTIC INFLAMMATORY EXUDATE.

(Id. at 24-25).


      Ms. Cutlip was discharged on January 30, 2009.  Dr.

Ciliberti prepared a discharge summary regarding Ms. Cutlip's

hospitalization at CAMC from January 17, 2009, to January 30,

2009, which states in pertinent part:

      ADMITTING DIAGNOSES: 32-year-old gravida 3, para 2,
      status post laparoscopic assisted vaginal
      hysterectomy, questionable tubo-ovarian abscess,
      abdominal pain, rule out appendicitis.

      DISCHARGE DIAGNOSES: 32-year-old gravida 3, para 2,
      status post laparoscopic assisted vaginal
      hysterectomy, questionable tubo-ovarian abscess,
      abdominal pain, rule out appendicitis. Status post
      surgical consultation rule out appendicitis
      recommending possible urology consult. No evidence of
      appendicitis. Status post exploratory laparotomy,
      drainage of intraabdominal abscess, excision and
      resection of necrotic sigmoid bowel, formation of
      Hartmann's pouch and descending colon end stoma with
      stoma maturation and right oophorectomy.

CONSULTATIONS:
1. Surgery service for rule out appendicitis.
2. Enterostomal care support team.
3. Gynecologic oncology for intraoperative surgical
assistance.

HOSPITAL COURSE: The patient was admitted on
01/17/2009 with the above-mentioned diagnosis. She was
placed on IV antibiotics and after approximately 5
days of IV antibiotic therapy without resolution of
symptomatology and with signs of worsening disease on
CT scan the patient was taken for exploratory
laparotomy. For a detailed operative report please see
dictation. Postoperatively, she was monitored on the
GYN floor.  . . . Gradually the patient developed a
return to normal bowel function with good stoma
output. . . .  She was discharged home on
postoperative day number 10 . . .

(Stip. at 25-26).[10]  After various follow-up appointments, Dr.

James Lohan of WVU Physicians & Surgeons reversed plaintiff's

colostomy on June 30, 2009.  (Id. at 28).

II.

This action is brought pursuant to the Federal Tort

Claims Act ("FTCA").  See 28 U.S.C. §§ 1346(b) and 2271-2680.

The government does not dispute that Dr. Ciliberti was acting in

the scope of his employment when he allegedly negligently

treated Ms. Cutlip.  It is further undisputed that plaintiff

filed the requisite administrative action under 28 U.S.C. §

2675(a).  Inasmuch as the alleged negligence took place in West

_____

[10] See supra note 4.

20

Virginia, the court applies West Virginia law.  West Virginia

Code section 55-7B-3 provides, in relevant part, as follows:

> (a) The following are necessary elements of proof that
> an injury or death resulted from the failure of a
> health care provider to follow the accepted standard
> of care:

> (1)  The health care provider failed to exercise that
> degree of care, skill and learning required or
> expected of a reasonable, prudent health care
> provider in the profession or class to which the
> health care provider belongs acting in the same
> or similar circumstances; and

> (2)  Such failure was a proximate cause of the injury
> or death.

W. Va. Code § 55-7B-3.


With respect to the standard of care, measured herein

as above, West Virginia Code section 55-7B-7 provides, in part,

that "the applicable standard of care and a defendant's failure

to meet the standard of care, if at issue, shall be established

in medical professional liability cases by the plaintiff by

testimony of one or more knowledgeable, competent expert

witnesses if required by the court."  W. Va. Code § 55-7B-7(a).


III.


As developed through the testimony at trial, the

question of malpractice centers on whether Dr. Ciliberti's

treatment decisions and performance during plaintiff's

21

hospitalization of January 17 through January 20 met the applicable standard of care. In view of the underlying facts found by the court above, resolution of this dispute hinges on the weight afforded the testimony of the parties' expert witnesses.

A.   Dr. Kent Miller

Plaintiff relies on the expert testimony of Kent G. Miller, M.D., F.A.C.O.G. ("Dr. Miller"), who is board certified by the American Board of Obstetrics and Gynecology and works in private practice in Gainesville, Georgia.[11] After completing his residency in obstetrics and gynecology in 1989, Dr. Miller worked in two different practices in Gainesville, Georgia, until 2001. During that 12-year period, Dr. Miller testified that he averaged approximately three to four hysterectomies per week and assisted other physicians with three or four per week. (Tr. at 122). Dr. Miller also treated patients both medically and surgically for tubo-ovarian abscesses approximately once every two to three months during that period. (Tr. at 124). Since 2001 when he left for private solo practice in an office-based capacity, Dr. Miller has not engaged in the active practice of

_____

[11] F.A.C.O.G. means "Fellow of the American Congress of Obstetricians and Gynecologists." See The America Congress of Obstetricians and Gynecologists, "What Does FACOG Mean?" at http://www.acog.org/About_ACOG/What_Does_FACOG_Mean.

gynecological surgery. (Tr. at 130). Similarly, Dr. Miller has not maintained operative privileges at any hospital since 2001.

Dr. Miller identified the following deviations from the standard of care: (1) Dr. Ciliberti's failure to go directly to the emergency room and evaluate his patient for a possible operative complication when he was notified of Ms. Cutlip's presentation on the morning of January 17, 2009 (Tr. at 144); (2) Dr. Ciliberti's failure to obtain a formal radiology consultation and to timely perform a CT-guided draining of her tubo-ovarian abscess ("TOA"), and to explore other options for obtaining the procedure when the unnamed radiologist refused to do so without specifying a reason (Tr. at 144-145); (3) Dr. Ciliberti's delay in taking plaintiff to surgery after eight days of "failed . . . hospitalization" from January 9 to 16 and an expanding mass in her pelvis (Tr. at 145); (4) Dr. Ciliberti's failure to seek timely assistance during the operation (Tr. at 145-146); and, (5) Dr. Ciliberti's improper technique during surgery that caused Ms. Cutlip's bowel injury. (Tr. at 147-148; see also Pl's Brief on Trial Proceedings at 24).

23

B.   Dr. Ted Anderson

        Defendant relies on the expert testimony of Ted Louis
Anderson, M.D., Ph.D. ("Dr. Anderson"), who is board certified
by the American Board of Obstetrics and Gynecology and serves as
director of the Division of Gynecology and Director of
Gynecological Surgery at the Vanderbilt University Medical
Center, in Nashville, Tennessee.  While his practice involves
the care and treatment of general gynecological patients, his
practice also involves the treatment and management of many
patients with complex gynecological problems.  Dr. Anderson sees
patients in his office approximately two days per week, performs
surgery approximately two days per week, and also oversees the
gynecology education programs at Vanderbilt University Medical
Center.  (Tr. at 242-43).  As part of his surgical practice, Dr.
Anderson performs around three to five hysterectomies per week
and sees two to three patients per month for both medical and
surgical treatment of tubo-ovarian abscesses.  (Tr. at 242-43).
He is actively engaged in the surgical practice of gynecology.
In addition to his experience in treating patients, Dr. Anderson
is an oral board examiner for the American Board of
Obstetricians and Gynecologists.  (Tr. at 244-46).  These
examinations test, in part, whether the practice patterns of
those taking the certification exam meet acceptable standards of

                              24

care.  (Id.).  He also serves on the executive board of the American College of Obstetricians and Gynecologists.

IV.

The central question presented by this case is whether Dr. Ciliberti met the standard of care when he examined, diagnosed, and treated Melissa Cutlip during her January 17 through January 20, 2009, hospitalization.  Having carefully weighed the opposing expert testimony on this issue, both broadly and in the particular, the court concludes that based on plaintiff's history and presentation during the applicable time period, Dr. Ciliberti's actions satisfied the relevant standard of care.

The court finds the testimony of Dr. Anderson more persuasive than that of Dr. Miller.  While the court finds no flaw in Dr. Miller's previous approximately 12 years of medical and surgical practice, Dr. Miller has not practiced surgical obstetrics and gynecology for over 10 years.  Dr. Anderson's ongoing experience as Director of Gynecology and of Gynecology Surgery at a renowned university hospital, together with his active surgical practice and role as a board examiner, is particularly impressive.  Indeed, the scope and breadth of his expertise was borne out at trial, where his demeanor and

measured, informative responses to the questions of court and counsel exhibited a command of the facts of the case and ability to explain complex medical terms and procedures with ease.  In a similar vein, Dr. Anderson's responses to each of Dr. Miller's critiques and to questions posed on cross-examination by skilled counsel for the plaintiff were not overwrought and appeared to flow from a genuine belief that Dr. Ciliberti acted reasonably. In contrast, the testimony of Dr. Miller that Dr. Ciliberti breached the standard of care was less convincing for several reasons, as set forth below.

First, Dr. Miller claimed that Dr. Ciliberti breached the standard of care by failing to come to the emergency room to see Ms. Cutlip on January 17, 2009, as soon as he was notified of her arrival.  Dr. Anderson disagreed with this conclusion on the grounds that plaintiff was hemodynamically[12] stable, her vital signs were stable, and she was not septic.  According to Dr. Anderson, Dr. Ciliberti met, and indeed exceeded, the standard of care by coming to the hospital to evaluate Ms. Cutlip approximately three hours after he learned of her arrival at the ER.  (Tr. at 256-58).  Viewed in light of Ms. Cutlip's

_____

[12] Hemodynamics relates to the functioning in the mechanics of blood circulation.  See MedilinePlus Medical Dictionary, a service of the U.S. National Library of Medicine and National Institutes of Health, at http://www.nlm.nih.gov/medlineplus/mplusdictionary.html.

condition at the time and the unquestioned resources provided by the CAMC emergency room and its attending personnel, it is not unreasonable or a violation of the standard of care that Dr. Ciliberti chose not to rush to the emergency room to visit plaintiff.

Next, Dr. Miller criticizes Dr. Ciliberti's failure to obtain a formal radiology consultation relating to a CT-guided draining of plaintiff's TOA, and criticizes his failure to explore other options for obtaining the procedure when the radiologist he consulted refused to do so without giving a reason. (Tr. at 144-145). Perhaps a further effort would have been feasible but plaintiff's assertion that Dr. Ciliberti should have sought out other radiologists practicing at CAMC or elsewhere to find one who would perform the procedure does not establish that a radiologist admitted to practice at CAMC would have found the procedure appropriate in this instance and, if it were, would have agreed to perform it or would have had the capability of doing so.

Dr. Ciliberti's personal visit to the radiologist at CAMC, including the radiologist's refusal, was amply documented by him. (Tr. at 79-80, 296; Joint Ex. 5 at 51). Dr. Anderson concluded that Dr. Ciliberti's consult with the declining radiologist was sufficient to meet the standard of care. The

27

court is not persuaded that Dr. Ciliberti breached the standard of care in his effort to ascertain the potential for CT-guided drainage of plaintiff's TOA.

Dr. Miller also opined that Dr. Ciliberti's delay in taking plaintiff to surgery after eight days of hospitalization from January 9 to 16 and an expanding mass in her pelvis violated the standard of care. (Tr. at 145).  As noted by both Dr. Anderson and Dr. Ciliberti, plaintiff was not in an emergent condition when she arrived at CAMC on January 17, 2009.  In Dr. Anderson's view, it was appropriate to restart IV antibiotics and wait to see if surgery could be avoided.  In fact, he believed that proceeding to surgery on January 17 would have increased the likelihood for a worse outcome, as there would have been a higher risk for possible peritonitis at that point. (Tr. at 258-63).  As Dr. Anderson noted, during the period of January 17 until her surgery on January 20, plaintiff remained hemodynamically stable, had normal kidney and liver function, was not septic, and her metabolic processes remained appropriate.  (Tr. at 260-63).  In sum, Dr. Anderson testified that it was appropriate for Dr. Ciliberti to follow the course he did in order to optimize Ms. Cutlip's condition and assemble necessary resources in an optimal way in advance of potential surgery.  (Id.).

During this time, Dr. Ciliberti ensured that IV antibiotics were administered, along with other IV fluids; considered the potential for CT-guided drainage of the abscess by consulting with a radiologist who declined to perform the procedure; consulted with a general surgeon to rule out appendicitis; spoke with several colleagues and at least one other surgeon, Dr. Schiano, concerning plaintiff's condition and treatment plan; and arranged the operation for a time when Dr. Shiano would be available to assist if needed.  In view of the fact that Ms. Cutlip responded favorably to IV antibiotics during her previous hospital admission, it was sound to believe that further administration of antibiotics by this method would be preferable to immediate surgery.  As noted above, Dr. Anderson's opinion that administration of IV antibiotics served to optimize Ms. Cutlip's condition for surgery by substantially reducing her risk of developing peritonitis is eminently reasonable.  (Tr. at 258-60).  The court is persuaded by Dr. Anderson's testimony in this regard, wherein he concluded that Dr. Ciliberti's decision to use three days to optimize Ms. Cutlip and assemble the resources necessary for the eventual surgery was "a very prudent move" and part of a "very logical plan."  (Tr. at 258-61; 281-82).

Dr. Miller also criticized Dr. Ciliberti for failing to timely seek intraoperative assistance from Dr. Schiano. (Tr. at 145-146). As an initial matter, it is clear that Dr. Ciliberti possessed the basic competency and qualifications to perform the surgery to remove plaintiff's tubo-ovarian abscess. (Tr. 72-73; 280). Dr. Miller testified that when Dr. Ciliberti surgically opened Ms. Cutlip and discovered the bowels matted in the pelvis with abscess adhering to those, he should have immediately called in Dr. Schiano. (Tr. 153-54). However, beyond pointing to the fact that the bowel injury occurred during surgery, plaintiff presents no other evidence to support Dr. Miller's conclusion that someone with proper "skill" should have been present in the operating theatre before Dr. Ciliberti attempted to remove the abscess. (Tr. at 146, 154). Dr. Anderson opined that a bowel injury can occur as a complication in the procedure to remove a tubo-ovarian abscess even when the highest degree of care is exercised. (Tr. at 272-77). He cogently explained as follows:

A. All of the tissue is, by definition of the infection and inflammation, is very friable, meaning that it's very fragile and delicate. You've had a lot of influx of water and fluid into the wall which has separated the normal layers of the wall. The serosa, which is kind of like the covering, the outside covering; the muscularis which is the muscle wall; and the mucosa which is kind of the business end of the intestines where all the glands are, and these layers kind of get separated because of all this

30

> edema. And so, in the process of dissecting the
> bowel off of the mass or dissecting one loop of
> bowel from another loop of bowel, it is possible,
> because of that edema, you can get a tear in the
> wall. In fact, that's actually not uncommon.

> Q.    Have you had that happen to you?

> A.    I have.

> Q.    And even though you exercise the highest degree
> of care, can an injury to the bowel occur while
> you are removing a tubo-ovarian abscess?

> A.    Absolutely.

(Tr. at 276-277).  As Dr. Anderson concluded, the risk of this
type of injury to the bowel is "not a function of the person
doing it, as much as it is the tissue you are doing it to."
(Tr. at 314).  Dr. Miller's testimony neither persuasively
refuted this conclusion nor did he credibly opine that a bowel
injury would not have occurred had Dr. Schiano been present at
the time Dr. Ciliberti removed the abscess.  (Tr. at 156).  In
short, the court concludes that Dr. Ciliberti did not deviate
from the standard of care in seeking the assistance of Dr.
Schiano at the moment he did.

31

In a similar vein, Dr. Miller is critical of Dr.
Ciliberti's method of removing the abscess, that is, by use of
blunt dissection.[13]  (Tr. at 147-148).  Dr. Miller opined as
follows:

> Blunt dissection is very rudimentary and it's not
> recommended. What happens to avoid these types of
> injuries in these particular cases is you have to
> operate on the bowel and get the bowel off the mass,
> not get the mass off the bowel. If you get the mass
> off the bowel, you will start pulling pieces of the
> bowel wall off. You will start injuring organs that
> are not supposed to be injured. So it's sort of a
> totally different focus. It's not I don't want to get
> the mass out, I want to operate on the bowel to get
> the bowel safely off the mass. That might entail
> leaving a little bit of the abscess wall on your bowel
> which is okay, much better than leaving a piece of the
> bowel, which is what happened here, on the mass.

(Tr. at 148).  The court finds Dr. Anderson's testimony on this
issue more credible.  Dr. Anderson explained that the use of
blunt dissection was entirely appropriate, as it allowed the
surgeon to feel the edges of the bowel and tissue planes in an
environment with distorted anatomy caused by the abscess.  (Tr.
at 275-76).  In this way, it also assists in reducing the risk

---

[13] Blunt dissection is a surgical separation of tissue
layers by means of an instrument without a cutting edge or by
the fingers.  See MedilinePlus Medical Dictionary, a service of
the U.S. National Library of Medicine and National Institutes of
Health, at
http://www.nlm.nih.gov/medlineplus/mplusdictionary.html.
In this case, Dr. Ciliberti freed up the abscess digitally,
that is, with his fingers.  (Tr. at 89).

of bowel injury in the presence of friable tissue.  (Tr. 275-276, 314).  He testified as follows:

> I would probably want to use blunt dissection in that
> case because I want to be able to feel the edge -- I
> want to use my tactile sense to feel the integrity of
> the bowel wall and to feel the limits of that. If I
> just randomly start going and cutting down there where
> I can't see, I can almost guarantee I'm going to cut
> across the bowel.

(Tr. at 319).  In view of Dr. Anderson's education and training,
and in particular his continuing experience both as an operating
surgeon and as director of the Division of Gynecology and
Gynecological Surgery at the Vanderbilt University Medical
Center, the court finds his explanation more compelling.
Ultimately, the court finds persuasive the expert opinion of Dr.
Anderson that Dr. Ciliberti satisfied the standard of care when
he examined, diagnosed, treated and operated upon Ms. Cutlip
during the relevant period.


                                V.


        A final note about the plaintiff, Melissa Cutlip,
merits mention.  Although the colostomy necessitated by her
bowel injury has since been reversed, the court observes that
Ms. Cutlip lived with it for around six months and has endured
still other post-operative distress.  The presence of such a
condition in a young woman is extremely unfortunate, especially
when she is charged with the care of two young children

                                33

requiring special attention, one of whom she felt it necessary, by virtue of her limitations of health, to place in the custody of another.  Indeed, plaintiff's testimony with respect to her perseverance in the face of serious medical problems was compelling.  However, the defendant could not guarantee the success of the surgery.  Rather, Dr. Ciliberti's duty was to use the degree of care and skill of a reasonably competent physician performing this operation on a patient such as Ms. Cutlip.  The bowel injury resulting in a six-month colostomy was an unfortunate complication and not the result of procedures employed by Dr. Ciliberti who exercised reasonable care and met the applicable standard of care required of him.

VI.

In view of the foregoing, the court concludes that Dr. Ciliberti was not negligent in his treatment of Melissa Cutlip during her January 17 through January 20, 2009, hospitalization, and that he met the applicable standard of care.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATE:  April 15, 2015

John T. Copenhaver, Jr.
United States District Judge

34